

Aaron T. Martin (No. 028358)
Martin Law & Mediation PLLC
11811 North Tatum Boulevard, Suite 3031
Phoenix, Arizona 85028
(602) 812-2680
aaron@martinlawandmediation.com

*Attorneys for Plaintiff
Dr. Greg J. Marchand*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| Dr. Greg J. Marchand, an individual, | Case No. |
|---|---|
| Plaintiff, | **APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| v. | |
| Taylor & Francis Group, LLC, a Delaware limited liability company, | *(Expedited Hearing Requested)* |
| Defendant. | |

Under Fed. R. Civ. P. 65, the Court should enter a temporary restraining order and preliminary injunction to prevent Defendant Taylor & Francis Group, LLC ("T&F") from causing irreparable harm to Plaintiff Dr. Greg J. Marchand's professional reputation by improperly retracting his published and peer-reviewed research article in breach of the parties' contract and T&F's duties of care as a publisher.

**I.    Background.**

    **A.    T&F Accepted Dr. Marchand's Article and Published it in the Journal.**

Dr. Marchand is a licensed doctor in Arizona who practices as an accredited master surgeon specializing in minimally invasive gynecologic surgery. Complaint, ¶ 20.[1] Dr. Marchand is also a research physician who has published more than 120 research articles. Complaint, ¶ 21. On May 3, 2023, Dr. Marchand submitted for publication in the Journal an article titled "Risk of all-cause and cardiac-related mortality after vaccination against

---

[1] Dr. Marchand's declaration is attached to the Complaint as Exhibit A.

1  COVID-19: A meta-analysis of self-controlled case series studies" (the "Article").
2  Complaint, ¶ 22. T&F accepted the Article for publication in Volume 19, Issue 2 of the
3  Journal, and stated that T&F would send Dr. Marchand an invoice for publication charges.
4  *See* Complaint, ¶ 23. On June 26, 2023, T&F sent Dr. Marchand an email regarding
5  publication of the Article in the Journal, which purported to include a link to an Author
6  Publishing Agreement, but Dr. Marchand did not receive and did not sign an Author
7  Publishing Agreement for the Article. Complaint, ¶¶ 24-25.
8        On June 26, 2023, T&F sent Dr. Marchand an invoice for $3,175.00 in charges to
9  publish the Article in the Journal. Complaint, ¶ 26. The publishing charge allowed T&F to
10 publish the Article as "open access online," Complaint, ¶ 27, which makes "published
11 academic articles freely and permanently available online" and that "[a]nyone, anywhere
12 can read and build upon this research." Complaint, ¶ 28. Dr. Marchand promptly paid
13 T&F's invoice for "open access" publication charges in full. Complaint, ¶ 29.
14       Once T&F accepts an article for publication, the article is subject to a thorough
15 vetting and review process, which may require corrections or modifications to respond to
16 the comments or concerns of peer reviewers or editors. Dr. Marchand and his co-authors
17 fully cooperated with T&F throughout the Journal's peer-review, editing and publication
18 process for the Article. Complaint, ¶ 30. On July 29, 2023, Dr. Marchand submitted
19 corrections to T&F's proof of the Article prior to publication. Complaint, ¶ 31. On
20 August 3, 2023, T&F published the Article in the Journal and made the Article available to
21 the public on the internet. Complaint, ¶ 32.
22       T&F only publishes articles after it has conducted an independent review process,
23 has received any required corrections, and has been satisfied that an article's data,
24 methodology, and conclusions are valid and supported. *See* Complaint, ¶ 33. T&F claims
25 that its policy is to maintain the integrity of a published article "extant, exact, and unaltered
26 to the maximum extent possible." Complaint, ¶ 35.
27       The Article did not contain political opinions or materials, but it received substantial
28 attention, debate, and interest in the medical, scientific, and other communities due to the



controversial subject matter. Complaint, ¶ 36. To date, T&F's website claims the Article has received nearly 150,000 views. Complaint, ¶ 37.

### B. T&F Published Two Letters to the Editor that Critiqued the Article, and Asked Dr. Marchand to Correct His Article.

One critique of the Article came in a letter to the editor from Mr. Somovilla del Saz, which T&F accepted for publication and subsequently published. Complaint, ¶ 38. On or about September 7, 2023, Dr. Marchand and a co-author submitted a response for publication in the Journal ("Response") titled "Response to Mr. Somovilla del Saz's letter to the editor regarding 'Risk of all-cause and cardiac-related mortality after vaccination against COVID-19: A meta-analysis of self-controlled case series studies." Complaint, ¶ 39. T&F accepted Dr. Marchand's Response on September 25, 2023 and published the Response on October 8, 2023. Complaint, ¶¶ 40-41.

Two months later, T&F published another letter to the editor from Dr. Black, which criticized the Article. Complaint, ¶ 44. Three months after Dr. Black's letter, on March 14, 2024, T&F sent an email to Dr. Marchand with a "publisher query" regarding the Article because "concerns have been raised" in Dr. Black's letter to the editor. Complaint, ¶ 45.

T&F explained that, based on its "editorial policies and the Committee on Publication Ethics (COPE) guidelines," T&F sent the Article "for confidential post-publication review to an independent expert" to "assess the methodology of the publication" and other "concerns raised." Complaint, ¶ 46. This post-publication review was duplicative of the thorough vetting and review process that T&F used before accepting and publishing the Article, but was after the issue in the Article had been more widely discussed in the medical community after the COVID pandemic. *See* Complaint, ¶ 47.

After this additional post-publication review, T&F asked Dr. Marchand to respond to "several concerns" the reviewer raised, including a specific query about "hazard ratios." Complaint, ¶ 48. Dr. Marchand and his co-author cooperated with T&F's request, and on April 11, 2024, provided a detailed written response to T&F's post-publication query and review to address the concerns raised. Complaint, ¶ 49. T&F responded that the explanation

addressed "the concern to some extent," but that "a few issues" would "warrant further clarification." Complaint, ¶ 50. T&F expressed that a correction notice was appropriate, and asked Dr. Marchand to "correct and revise your published paper" based on the reviewer's "criteria." Complaint, ¶ 51.

T&F claims that a correction notice is "issued when it is necessary to correct an error or omission, where the interpretation of the article may be impacted but the scholarly integrity or original findings remains intact." Complaint, ¶ 52. On May 9, 2024, Dr. Marchand responded that the reviewer's points were valuable additions that, "had they been suggested during the review process," would have been addressed before T&F accepted and published the Article. Complaint, ¶ 53. But Dr. Marchand stressed that the reviewer's points "neither correct any error nor represent an omission of any part of a paper that is essential to a meta analysis," and suggested that an addendum rather than a correction would be proper. Complaint, ¶ 54. On June 3, 2024, T&F insisted on a "Correction rather than an Addendum," and asked Dr. Marchand to "correct and revise your published paper." Complaint, ¶ 55.

Dr. Marchand and his co-authors submitted their "corrected manuscript" to T&F that addressed all concerns raised and, on September 3, 2024, T&F advised that the Journal's editor-in-chief and reviewer were "satisfied that the requested amendments have been addressed" and that T&F could "proceed with correcting the paper." Complaint, ¶¶ 56-57. Importantly, on October 16, 2024, T&F claimed that it would indicate in its "correction notice that the results have not been affected" by the amendments and corrections. Complaint, ¶ 58.

**C.    T&F Failed to Publish the Corrected Article and Threatened Retraction.**

Even though T&F had agreed to publish the amended Article after the corrections addressed any issues, T&F failed to publish the corrected Article, and later raised a new issue about the use of a fixed-effects analysis rather than a random-effects analysis. *See* Complaint, ¶¶ 59-60. Dr. Marchand expressed his frustration to T&F, but T&F neither responded to Dr. Marchand nor published the corrected Article for nine months. *See*



1  Complaint, ¶¶ 61-69.

2  Finally, in late July 2025, T&F responded to tell Dr. Marchand that it had "started afresh with an assessment by our more newly appointed data integrity editor" who agreed with prior concerns raised about the Article and identified "two new concerns." Complaint, ¶ 70. On August 1, 2025, Dr. Marchand responded that he and his co-authors would "submit a full detailed response to all presented allegations," but noted that the main conclusion of the Article had "not been questioned by any of the reviewers, commenters, or independent third parties and remains intact," that any corrections of alleged errors would not invalidate or alter the Article's main conclusion, and that T&F should have published the corrected version of the Article that Dr. Marchand submitted in July 2024 and that T&F accepted in September and October 2024. Complaint, ¶ 73.

T&F requested that Dr. Marchand provide a response in defense of the Article by September 5, 2025, which deadline T&F subsequently extended to September 14, 2025; Dr. Marchand and his co-authors provided a detailed response to T&F in defense of the Article the same day. Complaint, ¶¶ 74-75. On November 12, 2025, T&F sent Dr. Marchand an email that claimed "some of our major concerns regarding your article still remain unaddressed" and that T&F intended to publish a "retraction notice" regarding the Article. Complaint, ¶ 76. T&F asked Dr. Marchand to provide "any further new evidence to address our concerns" by November 24, 2025. Complaint, ¶ 77.

Under T&F's own policies and guidelines, "a Correction can correct an error or omissions where the interpretation of the article may be impacted but the scholarly integrity or original findings remains intact" but "a Retraction will be issued where the conclusions of the article are affected." Complaint, ¶ 71. Retraction notices are, in fact, one of the most extreme and negative actions that a publisher can take with respect to a previously published research paper, and retraction implies that the author(s) engaged in significant misconduct such as data fabrication, plagiarism, or other improprieties. Complaint, ¶ 79. Because of the severity of a retraction, T&F claims that a "decision to retract an article will be made in accordance with both [T&F] policies and COPE guidelines" after "a full investigation" by



1  T&F's "editorial staff in collaboration with the journal's editorial team." Complaint, ¶ 81.
2  The COPE guidelines provide that "[r]etraction is a mechanism for correcting the literature
3  and alerting readers to articles that have such seriously flawed or erroneous content or data
4  that their findings and conclusions cannot be relied upon." Complaint, ¶ 82. That is why the
5  COPE guidelines provide that retraction is "not appropriate" when a "correction would
6  sufficiently deal with the errors or concerns raised, provided that the main results and
7  conclusions are not unduly affected by the correction." Complaint, ¶ 84.

8        Contrary to T&F's policies and COPE's guidelines, T&F threatened to retract the
9  Article over two years after its publication based on purported minor, technical concerns
10 raised in letters to the editor from Mr. Somovilla del Saz and Dr. Black, which Dr.
11 Marchand and his co-authors spent substantial time and expense to fully address and correct
12 on multiple occasions, including in the published Response and in the corrected version of
13 the Article submitted in July 2024 that T&F accepted in September and October 2024 but
14 then failed to publish as agreed.[2] Complaint, ¶ 88.

15       At no point has T&F, the Journal, or any of their editors or reviewers accused Dr.
16 Marchand or his co-authors of misconduct, plagiarism, or data fabrication as a basis to
17 retract the Article. Complaint, ¶ 89. At no point has T&F, the Journal, or any of their editors
18 or reviewers challenged the Article's main conclusion as a basis to retract the Article.
19 Complaint, ¶ 90. And at no point has T&F, the Journal, or any of their editors or reviewers
20 identified any specific ethics, T&F policies, Journal policies, or COPE guidelines that Dr.
21 Marchand and his co-authors allegedly violated with respect to the Article or its corrected
22 version. Complaint, ¶ 91.

23       Neither T&F's policies nor the COPE guidelines require the retraction of the Article.
24 Complaint, ¶¶ 92-93. By pursuing a retraction, T&F is failing to comply with the COPE
25 guidelines and its policies. Complaint, ¶¶ 94-95. T&F intends to retract the Article not
26 based on any major concerns identified by an unbiased reviewer, but instead based on

---

[2] COPE guidelines also require T&F to inform authors "why the editor decided to investigate their article, what caused the editor to lose confidence in the article, and why that concern cannot be resolved by a correction." Complaint, ¶ 87.

- 6 -

monetary, political, and/or other ulterior and improper motivations of biased third-parties who have identified, at best, only minor, correctable, technical concerns about the Article, which Dr. Marchand has addressed or is willing to address. *See* Complaint, ¶ 96.

If T&F retracts the Article, that retraction would automatically trigger a report to the National Institute of Health that would place Dr. Marchand and his co-authors' names on a publicly available database that identifies the article as having been retracted and which would call into question—without explanation from Dr. Marchand—the nature of Dr. Marchand and his co-authors' other research. Complaint, ¶ 97. Retraction of the Article threatens immediate, irreparable harm to Dr. Marchand and his professional reputation, which would, among other things, negatively impact Dr. Marchand's career and professional opportunities, including his medical practice, his ability to obtain research grants, his ability to chair or participate in conferences, his ability to publish research and scholarly articles, and his standing in the medical community. Complaint, ¶ 99.

**II.    The Court Should Grant Injunctive Relief in Dr. Marchand's Favor.**

    **A.  The Injunctive Relief Standard.**

The Court may grant temporary restraining orders and preliminary injunctions. Fed. R. Civ. P. 65; *see also* A.R.S. §§ 12-1801 and 12-1803. A prohibitory preliminary injunction requires a party to refrain from taking action to preserve the status quo pending a determination on the merits. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

The Ninth Circuit uses a "sliding scale" approach under which "a stronger showing of one element may offset a weaker showing of another," such as "a stronger showing of irreparable harm to plaintiff" offsetting "a lesser showing of likelihood of success on the merits." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). The



Court may, for example, issue a preliminary injunction if "serious questions" on the merits are raised and the balance of hardships tips sharply in plaintiff's favor. *Id.* at 1131-32, 1134-35. "Serious questions" on the merits is "a lesser showing than likelihood of success on the merits." *Recovery Housing Academy LLC v. Candelario*, 562 F.Supp.3d 333, 339 (D. Ariz. 2022). "Serious questions" generally cannot be resolved at a preliminary hearing because they require more deliberative investigation. *Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir. 2023).

### B. Dr. Marchand is Likely to Succeed on the Merits.

#### 1. T&F Breached the Parties' Contract.

Dr. Marchand has a strong likelihood of success on his claim that T&F breached the parties' contract and the implied covenant of good faith and fair dealing. A breach of contract claim requires a plaintiff to prove "the existence of the contract, its breach and the resulting damages." *Graham v. Asbury*, 112 Ariz. 184 (1975). Every contract has an implied covenant of good faith and fair dealing that preserves the parties' reasonable expectations and precludes one party from acting to impair the other party's right to receive the benefits of the contract. *Bike Fashion Corp. v. Kramer*, 202 Ariz. 420, 423, ¶ 13 (App. 2002).

In this case, T&F's acceptance and publication of the Article,[3] T&F's policies, and COPE guidelines formed a contract between T&F and Dr. Marchand related to the Article. Dr. Marchand fully performed under the contract, including by fully cooperating with T&F in the editing, peer review and pre-publication process for the Article, paying T&F's publication charges, and providing T&F with a corrected version of the Article for publication after T&F identified minor issues in multiple, duplicative post-publication reviews. But T&F's threatened retraction of the Article in violation of T&F's policies and COPE guidelines would materially breach the contract and the implied covenant of good faith and fair dealing.

---

[3] Dr. Marchand did not specifically receive or sign an Author Publishing Agreement related to the Article, but the specific terms T&F proposed were present in the emails sent to and from Dr. Marchand at the time T&F accepted the Article. *See, e.g.*, Complaint, Ex. A, ¶¶ 18-19.



Specifically, T&F's policy is that a "decision to retract an article will be made in accordance with both [T&F] policies and COPE guidelines" after "a full investigation" by T&F's "editorial staff in collaboration with the journal's editorial team." Complaint, ¶ 81. T&F's policy is that letters to the editor "may raise issues with articles or spark debates or discussions . . . but should not ultimately be used as a route for objective corrective action." *Id.*, ¶ 72. COPE guidelines provide that "[r]etraction is a mechanism for correcting the literature and alerting readers to articles that have such seriously flawed or erroneous content or data that their findings and conclusions cannot be relied upon." *Id.*, ¶ 82. But retraction is "not appropriate" when "an editor is uncertain about the reliability of a publication." *Id.*, ¶ 83. Retraction is also "not appropriate" when a "correction would sufficiently deal with the errors or concerns raised, provided that the main results and conclusions are not unduly affected by the correction." *Id.*, ¶ 84. COPE guidelines provide that "retraction notices should be published as soon as the editor is confident that the publication is seriously flawed, misleading, or falls into" another appropriate category for retraction, and require a publisher to inform the authors "why the editor decided to investigate their article, what caused the editor to lose confidence in the article, and why that concern cannot be resolved by a correction." *Id.*, ¶¶ 85, 87.

But at no point has T&F, the Journal, or any of their editors or reviewers challenged the Article's main conclusion as a basis to retract the Article. *Id.*, ¶ 90. At no point has T&F, the Journal, or any of their editors or reviewers accused Dr. Marchand or his co-authors of misconduct, plagiarism, or data fabrication as a basis to retract the Article. *Id.*, ¶ 89. At no point has T&F, the Journal, or any of their editors or reviewers identified any specific ethics, T&F policies, Journal policies, or COPE guidelines that Dr. Marchand and his co-authors allegedly violated with respect to the Article or its corrected version. *Id.*, ¶ 91.

Neither T&F's policies nor COPE guidelines require or permit retraction of the Article. *Id.*, ¶ 92-93. T&F's threat to retract the Article, more than two years after its publication and based on purported minor, correctable technicalities identified in letters to the editor directly contradicts T&F's policies and COPE's guidelines and constitutes a

1  material breach of the parties' contract and the implied covenant of good faith and fair
2  dealing. T&F further breached the parties' contract and the implied covenant of good faith
3  and fair dealing by unreasonably extending, repeating, and delaying the review process for
4  the Article, and failing to publish the corrected version of the Article that Dr. Marchand
5  submitted in July 2024 and that T&F accepted in September and October 2024. Dr.
6  Marchand thus has a strong likelihood of success on his contract claim, or at a minimum,
7  has raised serious questions about the merits.

**2. Dr. Marchand is Entitled to a Declaratory Judgment.**

Dr. Marchand also has a strong likelihood of success on his claim for declaratory judgment. The Court has the power to declare the parties' rights, status, and other legal relations with respect to their contract and Article either before or after a breach. A.R.S. §§ 12-1832, 12-1833, and 12-1835. As set forth above, a dispute or controversy has arisen between T&F and Dr. Marchand regarding their contract, the published Article, and the corrected version of the Article that T&F accepted but did not publish, including but not limited to the threatened retraction of the Article. Dr. Marchand is entitled to a declaration that, among other things, T&F breached the parties' contract, T&F accepted and agreed to publish the corrected version of the Article rather than retracting the Article, T&F failed to comply with its own policies concerning corrections and retractions, T&F failed to comply with COPE guidelines concerning corrections and retractions, and T&F has no legitimate basis to retract the Article. The requested declaratory judgment will terminate the parties' controversy or remove an uncertainty. A.R.S. §§ 12-1835 and 12-1836.

**3. T&F Acted Negligently.**

Dr. Marchand has a strong likelihood of success on his negligence claim that T&F breached its duty of care to conform to industry publishing standards. Negligence requires a plaintiff to "prove four elements: (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 214 Ariz. 141, 143, ¶ 9 (2007). Duties of care may arise from, among other things,



a contractual relationship, conduct undertaken by the defendant, or as a matter of public policy. *Id.* at 144-45, ¶¶ 18-23.

Here, T&F owed Dr. Marchand a duty of care to comply with all industry standards related to responsible publishing in the academic and scientific journals, including recognized and accepted industry standards and policies related to peer review, post-publication reviews, corrections, and retractions. As set forth above, T&F breached its duty, including by failing to comply with T&F's own policies and COPE guidelines with respect to the Article. T&F's breach of its duties has caused and threatens to continue to cause substantial damage to Dr. Marchand.

**C. Dr. Marchand Will Suffer Irreparable Harm Without an Injunction.**

In the absence of injunctive relief, Dr. Marchand will suffer irreparable harm to his professional reputation, career, and personal goodwill. Generally, "economic injury alone does not support a finding of irreparable harm." *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). But "intangible injuries" may "qualify as irreparable harm." *Id.* The loss of reputation, customers, and goodwill "are often intangible and cannot be easily valuated" or "remedied with an award of monetary damages." *Forefront Dermatology S.C. v. Crossman*, 642 F.Supp.3d 947, 951-52 (D. Ariz. 2022); *see also Herb Reed Enterprises, LLC v. Florida Entertainment Mgmt.*, 736 F.3d 1239, 1250 (9th Cir. 2013) ("Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm."); *Recovery Housing Academy*, 562 F.Supp.3d at 342 ("Loss of goodwill supports a finding of the possibility of irreparable harm.").

Retraction notices are one of the most extreme and negative actions that a publisher can take with respect to a previously published research paper. T&F claimed that "a Correction can correct an error or omissions where the interpretation of the article may be impacted but the scholarly integrity or original findings remains intact" but "a Retraction will be issued where the conclusions of the article are affected." Retraction carries a negative connotation that would defame Dr. Marchand and unfairly imply he engaged in



significant misconduct such as data fabrication, plagiarism, or other improprieties. *See Recovery Housing Academy*, 562 F.Supp.3d at 340-41 ("A person may be liable for what he or she insinuates as well as what he or she says explicitly" that impeaches a party's business reputation). Retraction of the Article threatens immediate, irreparable harm to Dr. Marchand and his professional reputation, which would, among other things, negatively impact Dr. Marchand's career and professional opportunities, including his medical practice, his ability to obtain research grants, his ability to publish research and scholarly articles, and his ability to obtain academic appointments in university OBGYN departments, or to obtain consulting positions with major pharmaceutical or surgical device companies.

Retraction of the Article would also automatically trigger a report to the National Institute of Health that would place Dr. Marchand's and his co-authors' names on a publicly available database that would indicate that the Article has been retracted without any explanation from Dr. Marchand about how his proposed corrections to the Article would have addressed any concerns and removed the need for a retraction. Further, T&F's threatened retraction of the Article would likely include the publication of false information that defames Dr. Marchand within his profession and publicly places him in a false light. *See Recovery Housing Academy*, 562 F.Supp.3d at 340 ("courts routinely grant TROs restricting speech that is not merely false, but defamatory"). Once T&F retracts the Article, that bell cannot be unrung, and it would be difficult if not impossible for Dr. Marchand to quantify the various ways the retraction negatively impacts his professional reputation and opportunities.

**D. The Balance of Equities Favors Dr. Marchand.**

The equities weigh heavily in Dr. Marchand's favor. The Court should balance competing claims of injury and the effect on each party if the requested relief is granted or withheld. *Winter*, 555 U.S. at 24. An injunction that holds a party to contractually agreed terms, even if the party denies any breach, "should not be particularly harmful or unduly burdensome." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. McClafferty*, 287 F.Supp.2d 1244, 1249 (D. Haw. 2003).



As set forth above, Dr. Marchand will suffer significant, irreparable harm in the absence of injunctive relief. On the other hand, requiring T&F to comply with the parties' agreement and leave the Article undisturbed on its website pending adjudication of the merits will not cause T&F any hardship. Dr. Marchand already paid T&F all publishing charges for the Article, which T&F represented would allow "open access" to the Article and make it "freely and permanently available online" so "[a]nyone, anywhere can read and build upon this research." T&F also already subjected the Article to rigorous vetting and peer-review before publishing it. And T&F's proclaimed policy is to maintain the integrity of a published article "extant, exact, and unaltered to the maximum extent possible."

Even after publication, Dr. Marchand not only provided the Response that T&F published to address various concerns, but also provided a corrected version of the Article that T&F was "satisfied" had "addressed" all "requested amendments." T&F agreed to publish the corrected version of the Article with a "correction notice that the results have not been affected" by any corrections. Dr. Marchand would not oppose T&F publishing the corrected version of the Article as previously agreed, but T&F's sudden change of mind to retract the Article after many months of silence is completely unwarranted and demonstrates that a slightly longer delay will not prejudice T&F.

Further, T&F need not worry about its own reputation or liability if the Article remains undisturbed pending adjudication on the merits. T&F's website already warns readers that T&F "make[s] no representations or warranties whatsoever as to the accuracy, completeness, or suitability for any purpose of the Content" and that "[a]ny opinions and views expressed in this publication are the opinions and views of the authors, and are not the views of or endorsed by" T&F. T&F further claims that "[t]he accuracy of the Content should not be relied upon and should be independently verified with primary sources of information." And T&F expressly disclaims any liability or damages related to the Content of the Journal. *See also Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1037 (9th Cir. 1991) (stating that publishers do not owe a general duty to investigate the accuracy of a publication's contents). T&F will not suffer any hardship or prejudice if the Court grants



1  injunctive relief in Dr. Marchand's favor, but Dr. Marchand will suffer substantial
2  irreparable harm in the absence of injunctive relief. The balance of hardships thus tips
3  sharply in Dr. Marchand's favor.

**E. An Injunction is in the Public Interest.**

Granting an injunction would further the public's interest. The public interest is served by protecting a party's contractual rights. *Compass Bank v. Hartley*, 430 F.Supp.2d 973, 983 (D. Ariz. 2006); *c.f. 1800 Ocotillo, LLC v. WLB Group, Inc.*, 219 Ariz. 200, 202, ¶ 8 (2008) ("Society also broadly benefits from the prospect that bargains struck between competent parties will be enforced."); *Merrill v. Gordon*, 15 Ariz. 521, 531 (1914) ("Freedom of contract and freedom in the use and disposition of one's own are no less sacred than freedom of speech."). The public also has an interest in academic and scientific freedom that allows for investigation and debate on matters of public concern, including potentially controversial issues that involve public health such as COVID-19. *C.f. Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014) (recognizing a public interest in academic speech); *Molinelli-Freytes v. Univ. of Puerto Rico*, 792 F.Supp.2d 150, 163 (D. P.R. 2010) (recognizing a public interest in scientific research). T&F has already published both the Article and criticism of the Article, which allows the public and the academic and scientific communities to evaluate competing viewpoints and concerns. No public interest is served in retracting the Article more than two years after its publication.

Arguably, Dr. Marchand would have had no legal right to have the Article published if the Journal had exercised its editorial discretion in 2023 to reject the Article and declined publication. But in late 2025, the Journal cannot properly retract the Article in violation of its policies and COPE's guidelines after the Journal fully vetted the Article and subjected it to thorough peer review, decided to accept the Article, took Dr. Marchand's money for publishing charges, and published the Article online for the public. It would not serve the public interest to sanction T&F's breach of the parties' contract and allow T&F to hide or discredit the Article based on political and/or monetary interests of biased third parties.

**III.  Conclusion.**



- 14 -

For these and the foregoing reasons, the Court should enter a temporary restraining order and preliminary injunction that prevents T&F from breaching the parties' contract, from retracting the Article, from defaming Dr. Marchand, and from publicly placing Dr. Marchand in a false light.

DATED this 24th day of November, 2025.

By  */s/ Aaron T. Martin*
Aaron T. Martin
Martin Law & Mediation PLLC
11811 N. Tatum Blvd., Suite 3031
Phoenix, Arizona 85028
*Attorneys for Plaintiff*
*Dr. Greg J. Marchand*

