WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Greg J Marchand, | No. CV-25-04391-PHX-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| Taylor & Francis Group LLC, | |
| Defendant. | |

Before the Court is Plaintiff Greg J. Marchand's ("Marchand") Motion for a Temporary Restraining Order and in the alternative, a Motion for a Preliminary Injunction ("Motion"). (Doc. 2). Defendant, Taylor & Francis Group, LLC ("T & F") has filed a Response. (Doc. 11). Having reviewed the briefing, the Court will deny the Motion.

**I.   Background**

Marchand is a surgeon in this state, practicing gynecologic medicine, and a researcher with more than 120 published articles. (Doc. 1 at ¶¶ 20–21). T & F is a publisher of journals and books centered on topics that are academic, scholarly, or scientific. (*Id.* at ¶ 7). One of the journals published by T & F is called Human Vaccines & Immunotherapeutics (the "Journal"). (*Id.* at ¶ 8). The Journal publishes research on vaccines and immunotherapy with its primary audience being those in various medical professions and related fields. (*Id.* at ¶ 11). Marchand's article about the relationship between Covid-19 and death inducing heart disease was selected for publication by T & F on June 25, 2023. (*Id.* at ¶ 23). He paid T & F $3,175.00 to have it

published for free online, or have it be an open access publication. (*Id.* at ¶ 27).

The journal received and published two letters to its editor criticizing the article and its methodology. (*Id.* at ¶¶ 38–44). Marchand was allowed to respond to the first letter and T & F published it as well. (*Id.* at ¶ 41). The second letter triggered corrections to the article. (*Id.* at ¶ 45). A back and forth ensued between the parties about the sufficiency of the corrections and whether the corrected article would be published. (*Id.* at ¶¶ 50–59). At some point, during the back and forth on corrections, T & F told Marchand they might retract the article entirely. (*Id.* at ¶ 71). They also told him he could submit a response detailing his position on T & F's concerns by November 24, 2025. (*Id.* at ¶ 78). On that same day, Marchand filed his Complaint and the TRO currently pending before the Court. (Docs. 1 & 2). He asks that the Court grant his TRO to prevent T & F from retracting his article. (Doc. 2). For reasons explained below, the Court will not do so.

**II.     Legal Standard**

The analysis for a temporary restraining order is "substantially identical" to that of a preliminary injunction. *Stuhlbarg Intern. Sales Co, Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A party seeking a preliminary injunction must establish four elements: "(1) a likelihood of success on the merits, (2) that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tip in its favor, and (4) that the public interest favors an injunction." *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th Cir. 2014), *as amended* (Mar. 11, 2014) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). However, "if a plaintiff can only show that there are serious questions going to the merits," rather than a likelihood of success, "a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (citation modified). This is because the "elements of the preliminary injunction test must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). A plaintiff must meet all

four requirements—failure to satisfy his burden on even a single factor justifies denying relief. *See DISH Network Corp. v. FCC*, 653 F.3d 771, 776–77 (9th Cir. 2011). Ultimately, a preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez*, 680 F.3d at 1072 (citation modified). A preliminary injunction is never awarded as of right. *Winter*, 555 U.S. at 24.

## III. Discussion

The Court finds that none of the *Winter* factors weigh in favor of granting the requested injunctive relief. To begin with, Marchand has not established a likelihood of success on his breach of contract claim, his negligence claim, or his request for a declaratory judgment. He has also not shown that he will suffer irreparable harm in the absence of an injunction or that the balance of equities tip in his favor. The last factor of public interest, instead of favoring Marchand, favors T & F.

### A. Likelihood of Success on the Merits

A reasonable probability of success is all that needs to be shown for preliminary injunctive relief—an overwhelming likelihood is not necessary. *Candrian v. RS Indus., Inc.*, 2013 WL 2244601, at *3 (D. Ariz. May 21, 2013) (citing *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991)). "Serious questions are 'substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Gilder*, 936 F.2d at 422 (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2nd Cir. 1953)). "Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *Id.* (quoting *National Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985)).

#### i. Breach of Contract

A cognizable claim for breach of contract under Arizona law must allege that "(1) a contract existed, (2) it was breached, and (3) the breach resulted in damages." *Riverwalk Condo. Unit Owners Ass'n v. Travelers Indem. Co.*, 2018 WL 3774084, at *2 (D. Ariz.

June 28, 2018) (citing *Steinberger v. McVey ex rel. Cty. of Maricopa*, 318 P.3d 419, 434 (Ariz. Ct. App. 2014)).

Marchand argues that T & F's acceptance and publication of his article, T & F's internal policies, and guidelines published by the Committee on Publication Ethics[1] established a valid contract between him and T & F. (Doc. 2 at 8). He argues that he fully performed his part of the contractual agreement by participating in the editing, pre-publication peer review process, and paying T & F publication charges, as well as correcting his article when asked. (*Id.*) Marchand says "T&F's threatened retraction of the Article [is] in violation of T&F's policies and COPE guidelines [and] would materially breach the contract and the implied covenant of good faith and fair dealing." (Doc. 2 at 8). T & F counters that no contract between the parties exists; that if one did, T & F complied with its terms; but that regardless, the damages Marchand has alleged cannot be recovered on a breach of contract claim. (Doc. 11 at 6–8).

**a. Existence of a Contract**

For there to be an existence of a contract, the following elements are crucial: (1) offer; (2) acceptance; (3) consideration; and (4) enough specificity for the court to ascertain its terms. *Rogus v. Lords*, 804 P.2d 133, 135 (Ariz. Ct. App. 1991).

Establishing the existence of a valid contract requires Marchand to point the Court to its specific terms. *Williams v. Alhambra Sch. Dist. No. 68*, 234 F. Supp. 3d 971, 985 (D. Ariz. 2017) (requiring "sufficiently specific terms" for the court to find that a contract does in fact exist between the parties). Marchand has not done so. He concedes he "did not specifically receive or sign an Author Publishing Agreement related to the Article, but the specific terms T&F proposed were present in the emails sent to and from Dr. Marchand at the time T&F accepted the Article." (Doc. 2 at 8, fn. 3). But he does not identify the specific terms from these emails such that the Court can assess his likelihood of success on a breach of contract claim under Arizona law. *Hannibal-Fisher v. Grand*

---

[1] It appears that the Committee on Publication Ethics ("COPE") is not directly affiliated with T & F but rather is a non-profit whose purpose is to establish guidelines and advise editors and publishers on best practices. (Doc. 1-1 at 105, Ex. 13).

- 4 -

*Canyon Univ.*, 523 F. Supp. 3d 1087, 1093 (D. Ariz. 2021) (stating that while precision is not required to make out a contract's terms, the court must be able to discern a required material obligation). Indeed, even giving the most charitable interpretation to Marchand that there was an implied contract, one which was created by "conduct rather than words to convey the necessary assent and undertakings," *Corbin on Contracts* § 18, at 39 (1963), Marchand still has not laid out the terms of the implied contract. By not specifying the terms of the contract, Marchand has not shown that he is likely to establish the existence of a contract between the parties.

### b. Breach

Even assuming an enforceable agreement exists between the parties, the Court also finds that Marchand is unlikely to establish that T & F has breached any of the alleged policies or guidelines he says governs the agreement between himself and T & F. Marchand alleges that T & F has an internal policy that says: "a decision to retract an article will be made in accordance with both [T & F] policies and COPE guidelines after a full investigation by T & F's editorial staff in collaboration with the journal's editorial team." (Doc. 2 at 9) (quoting internal T & F policies). COPE and T & F guidelines clarify that "[r]etraction is a mechanism for correcting the literature and alerting readers to article that have seriously flawed or erroneous content or date that their findings and conclusions cannot be relied upon." (*Id.*) Marchand says "T&F's threatened retraction of the Article [is] in violation of T&F's policies and COPE guidelines [and] would materially breach the contract and the implied covenant of good faith and fair dealing." (Doc. 2 at 8).

Assuming T & F's editorial staff and team are bound to conduct a "full investigation" before making a decision to retract Marchard's article, nothing in the Motion or Complaint suggests they are doing otherwise. And it is undisputed that no retraction has yet occurred. In fact, it appears that after publishing Marchand's response to the first letter critical of his article, T & F then conducted a post-publication review of Marchand's article. (*Id.* at 3). After this post-publication review, Marchand was given another opportunity to provide a detailed written response to T & F's concerns that were unearthed by the review

- 5 -

process. (*Id.*) When Marchand protested incorporating additional corrections into his article, T & F explained the basis for these corrections and the difference between a corrected article and an addendum. (*Id.* at 4). Initially satisfied that Marchand's corrections complied with T & F's requests, T & F stated that they would publish the article. (*Id.*) However, T & F then alerted Marchand to yet another issue with his use of a "fixed-effects analysis rather than a random-effects analysis," which prevented T & F from publishing his corrected article. (*Id.*) In July of 2025, T & F informed Marchand that after consulting with their data integrity editor, they found even more concerns with his article and gave Marchand a deadline of September 5, 2025 (later extended to September 14, 2025), to address the new concerns identified by the data integrity editor. (*Id.* at 5). Marchand complied with this request, but not to the satisfaction of T & F. (*Id.*) T & F emailed Marchand that: "some of our major concerns regarding your article still remain unaddressed." (*Id.*) In that same email, Marchand was asked to provide any new evidence he could to placate T & F's concerns by November 24, 2025. (*Id.*) Instead, Marchand filed the current Complaint and accompanying TRO. Nowhere in the above chronology can the Court find that T & F breached the terms in the guidelines that Marchand has identified. The Court finds that Marchand has not presently established a likelihood of success on this element.

**c. Damages**

Marchand is also unlikely to be able to establish damages relating to any breach. To date, T & F has not actually retracted the article, so no damages have materialized. At best, Marchand's damages are speculative and disallowed for a breach of contract claim. *See Griffey v. Magellan Health Inc.*, 562 F. Supp. 3d 34, 51 (D. Ariz. 2021) (stating that a calculation of damages cannot be speculative or remote). And of course, emotional and reputational damages are not recoverable under Arizona law for breach of contract claims. *Manns v. PennyMac Loan Servs. LLC*, 2024 WL 3183130, at *3 (D. Ariz. June 26, 2024) (emphasizing that emotional and reputational harm is not recoverable under a breach of contract claim). Because Marchand cannot show he is entitled to contract damages, the

Court finds that he has no reasonable probability of success on his breach of contract claim.

### ii. Negligence

Marchand says he has a strong likelihood of success of his negligence claim because T &F failed to conform to industry publishing standards. (Doc. 2 at 10–11). In response, T & F argues that Marchand cannot establish T & F owed him a duty of care or that he sustained any damages. (Doc. 11 at 8–9).

Success on a negligence claim in Arizona requires the following: (1) duty requiring defendant to conform to certain standard of care; (2) a breach of that standard by the defendant; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages. *Gipson v. Kasey*, 150 P.3d 228, 230 (2007).

Marchand's negligence claim stalls before it even starts. He has not highlighted for the Court, nor can the Court find any authority supporting the proposition that a publisher owes a legally cognizable duty under Arizona negligence law to authors who publish in their publication. Absent a recognizable duty under Arizona law, Marchand has not shown he is likely to succeed on the merits of his negligence claim. The Court finds that Marchand has no reasonable likelihood of success on the merits for his negligence claim.

### iii. Declaratory Judgment

In his Complaint and Motion, Marchand asks the Court to declare that T & F breached an existing contract, and that T&F failed to conform to its own internal policies. (Docs. 1 & 2). T & F argues that Marchand is unlikely to succeed on the declaratory judgment claim because Marchand cannot make out his other claims on their merits. (Doc. 11 at 10–11). The Court agrees with T & F.

"[C]ourts in this district have found that the Federal Declaratory Judgment Act is a procedural statute, and therefore, under the Erie doctrine, Federal courts should apply the Federal Declaratory Act rather than the Arizona uniform Declaratory Judgment Act. *McNeill v. CP Boulders LLC*, 2025 WL 2161578, at *3 (D. Ariz. July 30, 2025). The Federal Declaratory Act allows the district courts to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is

or could be sought." 28 U.S.C. § 2201(a). The authority is entirely discretionary, and the district courts are not mandated to do anything.

The Court agrees with T & F that because has not established that he is likely to succeed on the merits of any of his claims at this juncture, he also cannot establish a likelihood that the Court will grant declaratory relief.

### B. Irreparable Harm

Marchand states that he will suffer irreparable harm because his reputation as a credible scholar will be tarnished if his article is retracted. (Doc. 2 at 11).

"An irreparable harm is one that cannot be redressed by a legal or equitable remedy following trial." *Optinrealbig.com. LLC v. Ironport Sys.,* 323 F.Supp.2d 1037, 1051 (N.D. Cal. 2004) (citing *Public Util. Comm'n v. FERC,* 814 F.2d 560, 562 (9th Cir. 1987)). Mere financial injury is not enough to support a finding of irreparable harm if adequate compensatory relief will be available during litigation. *Sampson v. Murray,* 415 U.S. 61, 89–90 (1974). In some cases, damage to reputation to or goodwill constitute irreparable harm, provided it is not too speculative. *Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir. 1991); *Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.,* 240 F.3d 832, 841 (9th Cir. 2001).

The Court notes that Marchand's alleged harm has not yet materialized and indeed may never materialize. The potentiality of Marchand suffering some injury to his reputation as a scholar as a result of T & F retracting his article is too speculative for the Court to conclude that he will suffer irreparable harm. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (stating that plaintiffs must establish that irreparable harm is likely, not just a possibility). At this juncture, the Court cannot find that Marchand will suffer irreparable harm.

### C. Balance of the Equities

In arguing that the balance of equities tip in his favor, Marchand mainly pushes what he deems to be the parties' agreement and contractual duties as the reason why the Court should find in his favor. (Doc. 2 at 12). On the other hand, T & F focuses its argument on

its First Amendment right to be free from prior restraints. (Doc. 11 at 12–13).

To determine the balance of equities, the court must "balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (citation omitted).

Having found that Marchand is unlikely to succeed on the merits of his breach of contract claim, the Court is hard-pressed to find that the balance of equities favors Marchand. Conversely, T & F's First Amendment rights certainly hang in the balance. Were the Court to grant the injunction, T & F would be forced to accommodate speech it may have no desire to accommodate or endorse. *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006) ("Rumsfeld") ("Some of this Court's leading First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say."); *Nat'l Rifle Ass'n of Am. v. City of Los Angeles*, 441 F. Supp. 3d 915, 943 (C.D. Cal. 2019) (holding that compelled speech involved "violations where the complaining speaker's own message was affected by the speech it was forced to accommodate."). The balance of equities disfavors Marchand, not T & F.

### D. Public interest

Again, Marchand centers his public interest argument on contractual rights by stating: "The public interest is served by protecting a party's contractual rights." (Doc. 2 at 14). To counter, T & F highlights its right to be free from government interference in its editorial decisions and telling it what it can and cannot publish. (Doc. 11 at 12). The Court agrees that as the facts of this case stand, it has no right to interfere in T & F's publishing decisions.

"Whereas the balance of equities focuses on the parties, '[t]he public interest inquiry primarily addresses impact on non-parties rather than parties,' and takes into consideration 'the public consequences in employing the extraordinary remedy of injunction.' " *hiQ Labs, Inc.*, 31 F.4th at 1202 (quoting *Bernhardt v. Los Angeles Cnty.*, 339 F.3d 920, 931-32 (9th Cir. 2003) (modification in original)).

While the Court recognizes the importance of the enforcement of contracts in a commercial transactions and settings, here Marchand has failed to sufficiently identify the enforceable terms of any agreement between the parties. *See First 100, LLC v. Omni Fin., LLC*, 2016 WL 3511252, at *3 (D. Nev. June 27, 2016) ("There is a public interest in the enforcement of contracts and judgments and in predictability in commercial transactions."). And publishers like T & F have genuine First Amendment rights and concerns. The Supreme Court has long held that private publishers have a First Amendment right to control the content of their publications as they see fit, free from the hawkish eye of the government. *Miami Herald Co. v. Tornillo*, 418 U.S. 241, 254–44 (1974). Absent clear contractual obligations that would limit these rights, the Court declines to impose restraints on a publisher's editorial discretion, which would go against the very firmament on which the First Amendment stands. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 557 (1976) (quoting *Patterson v. Colorado ex rel. Attorney General*, 205 U.S. 454, 462 (1907) ("(T)he main purpose of (the First Amendment) is 'to prevent all such previous restraints upon publications as had been practiced by other governments.'")). The public interest is best served by not granting Marchand's requested injunctive relief.

Accordingly,

**IT IS ORDERED** that Plaintiff Greg J. Marchand's Motion for a Temporary Restraining Order and in the alternative, a Motion for a Preliminary Injunction (Doc. 2) is **denied.**

Dated this 11th day of December, 2025.

Honorable Diane J. Humetewa
United States District Judge